## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

E.B., an individual,

　　　　　　　　　　　　　　　　*Plaintiff*

vs.

HOWARD    JOHNSON    by    WYNDHAM
NEWARK AIRPORT; WYNDHAM HOTELS &
RESORTS, INC.; KNIGHTS INN ELIZABETH;
RED LION HOTELS CORPORATION d/b/a/
RLH CORPORATION; AASHIRVAD LLC d/b/a
MOTEL 6 ELIZABETH – NEWARK LIBERTY
INT'L AIRPORT; MOTEL 6 CORPORATION;
G6 HOSPITALITY, LLC; THE BLACKSTONE
GROUP, INC.; RITZ MOTEL, FLORA MOTEL,
OAK GRAND MOTEL, ROYAL MOTEL, JOHN
DOES 1-10 (said names being fictitious) and XYZ
CORPORATIONS    1-10    (said    names    being
fictitious),

　　　　　　　　　　　　　　　　*Defendants.*

Case Number:
2:21-cv-02901(SDW)(LDW)

**PLAINTIFF    E.B.'S    FIRST
AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL**

Plaintiff, E.B., a resident of the State of New Jersey, by and through her undersigned counsel, by way of complaint against the defendants, HOWARD JOHNSON by WYNDHAM NEWARK AIRPORT; WYNDHAM HOTELS & RESORTS, INC.; KNIGHTS INN ELIZABETH; RED LION HOTELS CORPORATION d/b/a RLH CORPORATION; AASHIRVAD LLC d/b/a MOTEL 6 ELIZABETH – NEWARK LIBERTY INT'L AIRPORT; MOTEL 6 CORPORATION; G6 HOSPITALITY, LLC,; THE BLACKSTONE GROUP, INC.; RITZ MOTEL, FLORA MOTEL, OAK GRAND MOTEL, ROYAL MOTEL, JOHN DOES 1-10 (said names being fictitious) and XYZ CORPORATIONS 1-10 (said names being fictitious) says:

## INTRODUCTION

1.       This action for damages is brought by the plaintiff, a survivor of sex trafficking (hereinafter referred to as "Plaintiff" or by her initials "E.B."), under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), and New Jersey Law.

2.       E.B. was trafficked for commercial sex as a minor at the age of seventeen (17) years old. In or around August of 2019 she met her trafficker online via a third party and the social networking service Instagram. E.B. was contacted by an individual who provided E.B.'s contact information to her sex trafficker. The trafficker traveled to a train station close to E.B.'s home where E.B. provided him with a copy of her birth certificate and her Social Security card, both of which he held and never returned to her. The two then traveled via train into New York City and then into Brooklyn. E.B. then performed oral sex for one of her trafficker's friends on top of an apartment building in exchange for $40.00.

3.       In the ensuing months, until January 16, 2020, E.B. sexually serviced paying strangers, also known in the sex trafficking industry as "Johns", in the form of in and out calls at several defendant hotels in New Jersey. E.B.'s trafficker, and/or two other individuals who were working with him, would make the arrangements via advertisements on internet sites including but not limited to the free classified website Bedpage, the website CityXGuide, and the online dating app Tagged for E.B. at the defendant hotels. E.B. was required to give any money she collected from the "Johns" to her trafficker.

4.       During this time E.B. was sexually exploited under duress and subject to threats of physical assault, psychological torment, verbal abuse, and false imprisonment at the defendant hotels and these hotels profited from her exploitation.

2

5.      These hotels included the Ritz Motel located at 725 US-1 in Elizabeth, New Jersey; the Flora Motel located at 815 Flora St. in Elizabeth, New Jersey; Howard Johnson by Wyndham Newark Airport located at 20 Frontage Rd. in Newark, New Jersey; the Knights Inn located at 178 Spring St. in Elizabeth, New Jersey; the Oak Grand Motel located at 216 Spring St. in Elizabeth, New Jersey; Motel 6 Elizabeth-Newark Liberty Int'l Airport located at 819 Spring St. in Elizabeth, New Jersey; and the Royal Motel located at 511 Spring St. in Elizabeth, New Jersey.

6.      As a direct and proximate result of the negligence of the defendants in addition to their consistent refusals and/or failures to prevent human trafficking at their hotels, E.B. was sex trafficked, sexually exploited, and victimized repeatedly, both physically and mentally, at the defendant hotels.

7.      Plaintiff brings this action pursuant to the TVPRA 18 U.S.C. § 1595 and N.J.S.A. 2C:13-8.1 against the defendant hotels who each enabled, harbored, held, facilitated, and/or financially benefited from a sex trafficking venture in which E.B. was trafficked for the purpose of commercial sex, sexual exploitation, and physical and mental victimization in violation of the statutes listed herein.

8.      Plaintiff further submits that the named defendant hotels, in violation of TVPRA 18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex traffic in violation of the statute 18 U.S.C. § 1595(a).

## PARTIES

9.      The Plaintiff, identified herein by her initials E.B., was seventeen (17) years old when she was first sold for sex and trafficked throughout Elizabeth and Newark, New Jersey. Plaintiff currently resides in New Jersey.

10.     Plaintiff is a victim of trafficking pursuant to N.J.S.A. 2C:13-8.1 as well as 22 U.S.C. § 7102 and 18 U.S.C. § 1591(a) and a victim of "severe form of trafficking" as it is defined under 22 U.S.C. § 7102 (16).

11.     Defendant Howard Johnson by Wyndham Newark Airport is a hotel operated under the Defendant Wyndham Hotels and Resorts, Inc. ("Wyndham") brand. Wyndham is an international hotel and resort corporation offering public lodging services directly or through its affiliates, subsidiaries, and franchisees. The company licenses its hotel brands, including Super 8, Days Inn, Ramada, Microtel Inn & Suites, La Quinta, Baymont, Wingate, AmericInn, Hawthorn Suites, The Trademark Collection, and Wyndham to hotel owners in approximately 90 countries. Its corporate headquarters are located at 22 Sylvan Way, Parsippany, New Jersey, 07054. The "Howard Johnson by Wyndham" brand is a Wyndham brand hotel.

a.      As a hotel operator, Defendant Wyndham controls the training and policies for its hotels including the Howard Johnson by Wyndham Newark Airport hotel where E.B. was trafficked.

b.      Defendant Wyndham has stated that putting a stop to human trafficking is a major priority for their company and for their entire industry and that they support the UN Universal Declaration of Human Rights and the Polaris Project, which combats all forms of human trafficking.[1]

---

[1] Wyndham Hotels and Resorts, Inc., Social Responsibility – A Commitment to Protecting Human Rights available at https://corporate.wyndhamhotels.com/social-responsibility/ (last visited September 28, 2020).

4

c.      By and through its relationship with the staff at Howard Johnson by Wyndham Newark Airport where E.B. was trafficked, and the hotel guest perpetrator who trafficked E.B. at that location, Defendant Wyndham knowingly benefited, or received value from, its facilitation of, or participation in, a venture which it knew or should have known was engaged in and/or involved in sex trafficking.

d.      Wyndham receives a percentage of the gross room revenue from the money generated by the operations of the Howard Johnson by Wyndham Newark Airport location, including a percentage of the revenue generated from the rate charged from the room(s) in which Plaintiff was sex trafficked.

e.      Wyndham owns, supervises, and/or operated the Howard Johnson by Wyndham Newark Airport location located at 20 Frontage Road in Newark, New Jersey.

f.      Wyndham is subject to the jurisdiction of this Court because it is headquartered in New Jersey, regularly transacts business in New Jersey, operates hotels in New Jersey, contracts to supply services in New Jersey, derives revenue in the State of New Jersey, caused injuries to the Plaintiff in New Jersey, profited from an illegal sex trafficking venture at its hotel in New Jersey, and expects or should reasonably expect that its actions will have consequences in the State of New Jersey.

12.     Defendant Knights Inn is a hotel operated under the Defendant Red Lion Hotels Corporation d/b/a RLH Corporation ("RLH") brand. RLH is a United States hotel and resort corporation offering public lodging services directly or through its affiliates, subsidiaries, and franchisees. The company owns, manages, and franchises hotels under the Hotel RL, Red Lion Hotels, Red Lion Inn & Suites, GuestHouse, Settle Inn, Americas Best Value Inn, Canadas Best Value Inn, Signature and Signature Inn, Knights Inn, and Country Hearth Inns & Suites brands.

Its corporate headquarters is located at 1550 Market Street, Suite 425, Denver, Colorado, 80202. The "Knights Inn" brand is a Red Lion brand hotel with RLH acquiring the brand from Defendant Wyndham in or around April of 2018.[2]

     a.     As a hotel operator, Defendant RLH controls the training and policies for its hotels including Knights Inn hotel where E.B. was trafficked.

     b.     By and through its relationship with the staff at the Knights Inn hotel where E.B. was trafficked and the hotel guest perpetrator who trafficked E.B. at that location, Defendant RLH knowingly benefited, or received value from, its facilitation of, or participation in, a venture which it knew or should have known was engaged in and/or involved in sex trafficking.

     c.     RLH receives a percentage of the gross room revenue from the money generated by the operations of the Knights Inn location in Elizabeth, New Jersey, including a percentage of the revenue generated from the rate charged from the room(s) in which Plaintiff was sex trafficked.

     d.     RLH owns, supervises, and/or operated the Knights Inn location located at 178 Spring Street in Elizabeth, New Jersey and/or owned, supervised and/or operated the Knights Inn location from August of 2019 through January of 2020.

     e.     RLH is subject to the jurisdiction of this Court because it regularly transacts business in New Jersey, operates hotels in New Jersey, contracts to supply services in New Jersey, derives revenue in the State of New Jersey, caused injuries to the Plaintiff in New Jersey, profited from an illegal sex trafficking venture at its hotel in New Jersey, and expects or should reasonably expect that its actions will have consequences in the State of New Jersey.

---

[2] RLH Corporation - "RLH Corporation Enters Into Definitive Agreement to Acquire the Knights Inn Brand From Wyndham Hotel Group" News Release, April 4, 2018 available at https://ir.redlion.com/news-releases/news-release-details/rlh-corporation-enters-definitive-agreement-acquire-knights-inn (last visited September 28, 2020)

13.     Defendant Aashirvad LLC d/b/a Motel 6 Elizabeth – Newark Liberty Intl Airport is a hotel operated under the Defendant Motel 6 ("Motel 6") brand which is operated by management company G6 Hospitality, LLC ("G6") and owned by Defendant The Blackstone Group, Inc. ("Blackstone"). By their own admission, Motel 6 is the largest owned and operated hotel chain in North America with locations across the United States and Canada. G6 owns, operates, and franchises more than 1,400 economy lodging locations under the Motel 6 and Studio 6 brands in the United States and Canada and the Hotel 6 brand in India. Defendants Motel 6 and G6 are both headquartered at 4001 International Parkway, Carrollton, Texas, 75007. Defendant Blackstone is a private equity alternative investment firm with its headquarters at 345 Park Avenue, New York, New York, 10154.

a.     As a hotel operator, Defendants Motel 6, G6, and Blackstone control the training and policies for its hotels including the Motel 6 location where E.B. was trafficked.

b.     Defendants Motel 6 and G6 have stated that "nothing is more important" to their company than the "safety and well-being of our guests, our team members, and the communities in which we operate" and that they implement a variety of practices that help to prevent human trafficking through enhanced safety and security procedures; employee and franchise education, training and response; and partnerships and advocacy.[3]

c.     By and through its relationship with the staff at the Motel 6 hotel where E.B. was trafficked and the hotel guest perpetrator who trafficked E.B. at that location, Defendants Motel 6, G6, and Blackstone knowingly benefited, or received value from, its facilitation of, or participation in, a venture which it knew or should have known was engaged in and/or involved in sex trafficking.

---

[3] Motel 6 – Our Efforts to Help Prevent Human Trafficking, available at https://www.motel6.com/en/faq.html (last visited September 29, 2020)

7

d.    Motel 6, G6, and Blackstone receive a percentage of the gross room revenue from the money generated by the operations of the Motel 6 location in Elizabeth, New Jersey, including a percentage of the revenue generated from the rate charged from the room(s) in which Plaintiff was sex trafficked.

e.    Motel 6, G6, and Blackstone owns, supervises and/or operate the Motel 6 located at 819 Spring Street in Elizabeth, New Jersey.

f.    Motel 6, G6, and Blackstone are subject to the jurisdiction of this Court because they regularly transact business in New Jersey, operate hotels in New Jersey, contract to supply services in New Jersey, derive revenue in the State of New Jersey, caused injuries to the Plaintiff in New Jersey, profited from an illegal sex trafficking venture at their hotel in New Jersey, and expects or should reasonably expect that its actions will have consequences in the State of New Jersey.

## SEX TRAFFICKING UNDER FEDERAL LAW

14.    Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102 as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."

15.    Essentially, this definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

16.    Addressing the elements in reverse, sex trafficking is the long pre-existing crime of slavery but for the *purpose* of commercial sex, and incorporates the already existing crimes prohibited by 18 U.S.C. § 1589 and § 1590. The crime of slavery is made up of the two remaining elements, the *act* and the *means*. The *act* is the "harboring, transporting, providing, or obtaining"

8

of forced labor, codified as a violation of 18 U.S.C. § 1590, while the *means* is labor "obtained or provide by force, fraud, or coercion" and is codified in 18 U.S.C. § 1589.

17.    Therefore, while "sex trafficking" is specifically defined in the more recently passed legislation TVPRA 22 U.S.C. § 7102, and is specifically prohibited under 18 U.S.C. § 1591, it is nevertheless a long-recognized and familiar atrocity.

18.    Pursuant to 18 U.S.C. § 1591(a), all who knowingly provide *or* obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking. As such, this includes both the "traffickers" who recruit, harbor, transport, and provide individuals for forced commercial sex work *and* the "Johns" or "buyers" who obtain, solicit, or patronize forced commercial sex work.

19.    Crucially, 18 U.S.C § 1595 (hereinafter "section 1595") provides a civil remedy for any individual who is a victim of sex trafficking and entitles that person to bring a civil action against "the perpetrator" as well as those parties who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in" sex trafficking.

20.    Several U.S. District Court opinions have held that among the claims permitted by section 1595 are those brought by sex trafficking victim plaintiffs against major corporate franchisor hotels who may be deemed a party upon which liability could be imposed should a jury find the business benefitting from participating in a venture it knew or should have known engaged in trafficking.[4]

---

[4] See A.B. v. Marriott International, Inc., No. 19-5770, 2020 WL 1939678 (E.D. Pa. April 22, 2020); Doe S.W. v. Lorain-Elyria Motel, Inc. No. 19-1194, 2020 WL 1244192 (S.D. Ohio, Mar. 15, 2020); H.H. v. G6 Hospitality, LLC, No. 19-755, 2019 WL 6682152 (S.D. Ohio, Dec. 6, 2019); M.A. v. Wyndham Hotels & Resorts, Inc., No. 19-849, 2019 WL 4929297 (S.D. Ohio Oct. 7, 2019); see also M.L. v. Craigslist, Inc., No. 19-6153 (W.D. Wash.) (report and recommendation from magistrate judge recommending denial of Wyndham's motion to dismiss)

9

21.     At least two (2) Courts, the United States District Court for the Southern District of Ohio and the United States District Court for the Eastern District of Pennsylvania, have affirmatively ruled that section 1595 is distinct from the criminal liability established by 18 U.S.C § 1591.[5]

22.     Specifically, the Eastern District of Pennsylvania has interpreted the 2008 amendments to section 1591 as Congress providing victims of sex trafficking with a civil remedy against "whoever knowingly benefits" from participation in a venture the person "knew or should have known engaged" in a violation of the TVPRA.[6]

23.     The Court further opined that the crucial difference between TVPRA's criminal and civil liability was Congress's addition of the phrase "knew or should have known" in the language of section 1595, which the Court noted "echoes common language used in describing an objective standard of negligence."[7]

## SEX TRAFFICKING UNDER NEW JERSEY LAW

24.     Sex trafficking is prohibited in New Jersey pursuant to N.J.S.A. 2C:13-8(1) which holds that a person commits the crime of human trafficking if they "knowingly holds, recruits, lures, entices, harbors, transports, provides or obtains, by any means, another, to engage in sexual activity as defined by paragraph (2) of subsection a. of" N.J.S.A. 2C:34-1, which defines prostitution and related offenses.

25.     A person also commits human trafficking pursuant to N.J.S.A. 2C:13-8(2) if he or she "receives anything of value from participation as an organizer, supervisor, financier, or

---

[5] See A.B., 2020 WL1939678 at *9; Doe S.W., 2020 WL 1244192, at *6; H.H., 2019 WL 6682152, at *3; There are six civil sex trafficking cases brought against hotels pending before The Honorable Algenon L. Marbley, United States District Court for the Southern District of Ohio.
[6] See A.B., 2020 WL1939678 at *8.
[7] See A.B., 2020 WL1939678 at *7.

manager in a scheme or course of conduct which violates paragraph (1) of this subsection" or pursuant to N.J.S.A. 2C:13-8(3) if he or she "knowingly holds, recruits, lures, entices, harbors, transports, provides or obtains, by any means, a child under 18 years of age, to engage in sexual activity as defined in paragraph (2) of subsection a. of N.J.S. 2C:34-1, whether or not the actor mistakenly believed that the child was 18 years of age or older, even if that mistaken belief was reasonable."

26.     Similar to its Federal counterpart, New Jersey allows for a civil remedy for those victims of sex trafficking via N.J.S.A. 2C:13-8.1(a), which states that "Any person injured, including injury due to the loss of moneys or property, real or personal, by an actor and all those acting in concert with that actor who committed a human trafficking offense in violation of section 1 of P.L.2005, c. 77 (C.2C:13-8) or section 5 of P.L.2013, c. 51 (C.2C:13-9) may bring a civil action in any court of competent jurisdiction against the actor and all those acting in concern with that actor."

## FACTUAL ALLEGATIONS

**A.     The Role of Hotels and Motels in The Sex Trafficking Industry**

27.     The hospitality industry plays a crucial role in the sex trafficking industry.[8]

28.     Since 2007, the Polaris Project – a nonprofit, non-governmental organization that works to combat and prevent modern-day slavery and human trafficking - has operated the National Human Trafficking Hotline, which is funded by the U.S. Department of Health and

---

[8] See Giovanna L.C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), available at https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1000&context=honorstheses

Human Services (HHS), Administration for Children and Families and through non-governmental sources. [9]

29.    Since the beginning of the National Human Trafficking Hotline in December 2007 through December 31, 2017, the Hotline has recorded 3,596 cases of human trafficking involving a hotel or motel, and, furthermore, 75 percent of survivors in the Polaris Project survey reported coming into contact with hotels at some point during their trafficking situation.[10]

30.    Hotels are a crucial piece of the infrastructure necessary to facilitate human trafficking in escort services, which primarily function one of two ways: an "in-call" model or an "out-call" model.[11]

31.    In-calls are when the trafficker or victim books the hotel room where the victim is usually confined while Johns cycle in and out. This cyclical business operation is often repeated in numerous hotels as the trafficker moves victims and business throughout the region or country.[12]

32.    "Out-calls" are when the victim is delivered to the Johns' location, which is often a hotel room but can also be a residence.[13]

33.    Perhaps unsurprisingly, Johns in the sex trade typically choose to engage in trafficking away from their home, leading to the increased involvement of hotels.[14]

34.    Contrary to popular misconception, trafficking does not only take place in cheap hotels or motels with sub-par accommodations. Instead, traffickers running in-call escort

---

[9] National Human Trafficking Hotline – Office on Trafficking in Persons, available at https://www.acf.hhs.gov/otip/victim-assistance/national-human-trafficking-hotline (last visited September 30, 2020)
[10] "On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking," The Polaris Project, p. 16, July, 2018, available at https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf (last visited September 30, 2020)
[11] Id. at 18.
[12] Id.
[13] Id. at 19.
[14] See Cavagnaro, at 3-5.

businesses look for a range of factors including convenient locations, buyer comfort, price, a hotel's policies, procedures, and infrastructure, and whether the hotel is prone to law enforcement monitoring.[15]

35.     As a result of these needs, trafficking may often occur at hotel chain franchises that offer a good balance of quality and price while giving Johns a sense of anonymity and safety. [16]

36.     Survivors in Polaris Project focus groups also mentioned that these hotels are perceived by traffickers to have distracted and busy staff, which allows trafficking to go undetected. [17]

37.     Crucially, an in-call trafficking business model can provide hotel staff with more opportunities for identification since the victim and trafficker are typically both on site for an extended period of time (as opposed to one night). In these cases, there is typically a reservation and payment footprint associated with the victim or trafficker, and there is usually more foot traffic on the property from buyers.[18]

38.     Hotel employees are in a unique position because they have the ability to detect possible red flags that may indicate potential human trafficking in both traffickers and victims due to their proximity to hotel guests and access to their rooms.[19]

39.     Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in hotels is a frequent and obvious occurrence and, although unutilized,

---

[15] "On-Ramps…" The Polaris Project, supra at 18.
[16] Id.
[17] Id.
[18] Id.
[19] Id. at 20.

13

underutilized, or ineffectually utilized, well-researched training programs and toolkits have been published to assist hotel staff in every position to identify the signs of sex trafficking activity.[20]

40.     Some observable indicators which could suggest sex trafficking escort services are taking place at a hotel include but are not limited to: paying for the hotel in cash or with pre-paid credit cards; checking in for extended stays with few possessions; checking in for short stays with excessive luggage; reserving a room initially for one night, but extending day-by-day; requesting room(s) overlooking the parking lot or not within view of the front desk; the presence of excessive drugs or sex paraphernalia; excessive condoms in trash cans; frequently asking for new towels, washcloths, and/or linens; excessive foot traffic in/ out of rooms; checking in alone but requesting two beds, two keys, etc.; booking multiple rooms under one name; one person (or couple) checking in with several females; the hotel staff observes the same female(s) on different visits with different men; a guest is overly concerned with surveillance cameras or entrance policies; a female is dropped off and visits for 30 minutes to 1 hour only; someone waits onsite (e.g. in the parking lot) for the female; and/or a room is booked with a business card but is paid for in cash.[21]

41.     More general indicators of sex trafficking occurring at hotels include: verbal or physical abuse; restricted or controlled communications; no freedom of movement or evidence of constant monitoring; no control of money, cell phone, or ID; exhibits fearful, anxious, or submissive behavior; dresses inappropriate given the climate; no knowledge of current or past whereabouts; and/or, signs of poor hygiene, malnourishment, or fatigue.[22]

---

[20] Department of Homeland Security, *Blue Campaign – Hospitality Toolkit*, available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited September 30, 2020)
[21] See "On-Ramps…" The Polaris Project, supra at 20.
[22] See id.

14

42.     The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years. In 2010, the United States Department of Homeland Security's Blue Campaign commenced as a collective effort to end "the heinous crime of human trafficking in the United States"[23] which sought to educate both the public and private sectors regarding the identification and combating of human trafficking, including the hospitality industry, by way of online resources and toolkits publicly accessible to any entity concerned with human trafficking.[24]

43.     Research has shown that while hoteliers feel trafficking is a global problem, they generally do not believe that trafficking is an issue in their own hotels and that in terms of potential initiatives to mitigate the problem the two largest needs are training and awareness.[25]

44.     Hospitality companies possess the means, capability, and responsibility to deter sex trafficking at their hotel locations but have repeatedly failed to do so in neglecting their own policies and by doing so facilitate such abhorrent activities all while continuing to profit from same.

**B.  Defendants Help Control The Hospitality Industry**

45.     Hotel brands lend their name and likeness to third-party owners while the building itself and operations are run by a franchisee or third-party management company under the brands' control.

46.     In return, the parent brand exchanges the high risk inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement and is still able to profit from those patronizing the hotel.

---

[23] *DHS Blue Campaign Five Year Milestone*, Department of Homeland Security, July 22, 2015, available at https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone (last visited October 1, 2020)
[24] *Human Trafficking and the Hospitality Industry*, Department of Homeland Security, available at https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited October 1, 2020)
[25] See Cavagnaro, at 1.

47.     These patrons – the average consumers – do not witness this relationship. The parent brand gives the property its identity by providing signage containing its name, logo, and iconography on the front of the building - and, likely, within the building on items from the giveaway pens to staff uniforms - all with the intent of assuring customers that if they check into their hotel(s) they can expect the standards consistent with the parent hotel brand.

48.     In addition to brand recognition, marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel databases, the parent brand provides the local franchisee hotel with access to its brand-wide central reservation system, 1-800 number, revenue management tools, loyalty programs, and website. Via these techniques, booking and reservation can be controlled by the corporate parent brand.[26]

49.     The local hotel typically pays a percentage of their total revenue to the parent brand and is required to develop and maintain the property in accordance with the parent brand's standards as directed by the franchise agreement(s) in place.

50.     Typically, per such contract or franchise agreement, the parent brand may enforce these standards through periodic inspections of the property and even termination of the agreement if the hotel is found to be inadequate.

51.     At the time of the incidents alleged herein:

a.     Defendant Wyndham owned and controlled the "Howard Johnson by Wyndham" brand.

b.     Defendant RLH owned and controlled the "Knights Inn" brand.

---

[26] Ellen Meyer, "The Origins and Growth of Franchising in the Hotel Industry" *Lodging Magazine*, April 10, 2018, available at https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/ (last visited October 1, 2020)

16

c.    Defendants Motel 6, G6, and/or Blackstone owned and controlled the "Motel 6" brand.

## C. Defendants' Willful Blindness to Sex Trafficking at Their Hotels

52.    The Defendants in this matter have been on notice of repeated sex trafficking occurring at their hotels, yet the individual franchise owners and brand managers alike have failed to take necessary action(s) to prevent sex trafficking from occurring.

53.    Defendant Wyndham controlled, owned, supervised, and/or operated the Howard Johnson by Wyndham Newark Airport located at 20 Frontage Road in Newark, New Jersey where Plaintiff was sex trafficked during the time period alleged herein.

54.    Defendant RLH controlled, owned, supervised, and/or operated the Knights Inn located at 178 Spring Street in Elizabeth, New Jersey where Plaintiff was sex trafficked during the time period alleged herein.

55.    Defendants Motel 6, G6, and/or Blackstone controlled, owned, supervised, and/or operated the Motel 6 located at 819 Spring Street in Elizabeth, New Jersey where Plaintiff was sex trafficked during the time period alleged herein.

56.    Defendant Ritz Motel controlled, owned, supervised, and/or operated the Ritz Motel located at 725 US-1 in Elizabeth, New Jersey where Plaintiff was sex trafficked during the time period alleged herein.

57.    Defendant Flora Motel controlled, owned, supervised, and/or operated the Flora Motel located at 815 Flora Street in Elizabeth, New Jersey where Plaintiff was sex trafficked during the time period alleged herein.

17

58.    Defendant Oak Grand Motel controlled, owned, supervised, and/or operated the Oak Grand Motel located at 216 Spring Street in Elizabeth, New Jersey where Plaintiff was sex trafficked during the time period alleged herein.

59.    Defendant Royal Motel controlled, owned, supervised, and/or operated the Royal Motel located at 511 Spring Street in Elizabeth, New Jersey where Plaintiff was sex trafficked during the time period alleged herein.

60.    Each and every Defendant failed to implement and enforce their respective policies and/or to create, implement and enforce a policy that would protect Plaintiff E.B. from being trafficked.

61.    Defendant Wyndham knew or should have known that the Howard Johnson by Wyndham hotel location where Plaintiff was trafficked for commercial sex was in an area known for high incidents of crime and prone to sex trafficking activity on and around the hotel premises, including where Plaintiff was trafficked.

62.    Defendant RLH knew or should have known that the Knights Inn hotel location where Plaintiff was trafficked for commercial sex was in an area known for high incidents of crime and prone to sex trafficking activity on and around the hotel premises, including where Plaintiff was trafficked.

63.    Defendants Motel 6, G6, and/or Blackstone knew or should have known that the Motel 6 hotel location where Plaintiff was trafficked for commercial sex was in an area known for high incidents of crime and prone to sex trafficking activity on and around the hotel premises, including where Plaintiff was trafficked.

64.     Despite possessing knowledge of the extensive prostitution and sex trafficking occurring at their hotels, Defendants repeatedly failed to take appropriate steps to thwart these activities.

65.     These Defendant parent brands – Wyndham, RLH, Motel6/G6/Blackstone – can exercise control over their hotels by:

a.     Distributing information to assist employees in identifying human trafficking;

b.     Providing a process for escalating human trafficking concerns within the organization;

c.     Requiring all employees to attend training related to human trafficking;

d.     Providing new hire orientation on human rights and corporate responsibility;

e.     Providing training and education to their hotels through webinars, seminars, conferences, and online portals;

f.     Developing and holding ongoing training sessions on human trafficking;

g.     Conducting audits of training protocols; and/or

h.     Providing checklists, escalation protocols, and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

66.     Defendant Wyndham was in an actual and/or apparent agency relationship with its Howard Johnson by Wyndham brand hotels offering public lodging services.

67.     Defendant RLH was in an actual and/or apparent agency relationship with its Knights Inn brand hotels offering public lodging services.

68.     Defendants Motel 6/G6/Blackstone were in an actual and/or apparent agency relationship with its Motel 6 brand hotels offering public lodging services.

69.     The agency relationships between Defendants and their brand hotels were created and are maintained through the Defendants' exercise of an ongoing and systemic right of control over their respective brands, including the means and methods by which these brands conduct their daily business including:

a.     Hosting online bookings on the Defendant parent brand's domain;

b.     Requiring their hotels to use their brand name customer rewards programs;

c.     Setting parameters on employee wages;

d.     Making employment decisions;

e.     Advertising for employment;

f.     Sharing profits;

g.     Standardized training methods for employees;

h.     Building and maintaining the facility in a manner specified by the Defendant parent brand;

i.     Creating standardized and/or enforcing strict rules of operation;

j.     Regularly inspecting the facility and operation by the Defendant parent brand;

k.     Fixing prices; or,

l.     Performing other actions that deprive the local franchise hotels of any independence in their business operations.

70.     Apparent agency exists between the Defendant parent brands as they each hold out their brands to the public as their direct alter-egos with each possessing authority to act on the other's behalf.

71.     Given the Defendant parent brands' public statements on behalf of their brands and the control they have assumed in educating, implementing, and directing their respective hotels, Defendants breached their duties in the following, non-exclusive, ways:

a.     Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

b.     Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

c.     Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

d.     Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

e.     Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; and/or

f.     Failed (altogether or adequately) to provide checklists; escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

21

## D. The Sex Trafficking of E.B.

72.    While victimized by her traffickers in New Jersey from August, 2019 through January, 2020, E.B. was subject to repeated instances of sexual assault and abuse, threats of physical assault and abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendant hotels named herein.

73.    E.B. was required to have sex for payment with various Johns at the Defendant hotels in response to advertisements for commercial sex that her trafficker posted on the free classified website Bedpage, the website CityXGuide, and the online dating app Tagged.

74.    E.B.'s trafficker controlled her – including her movements, her diet, and by withholding her identification documents – under threats of violence if she did not conform to his rules.

75.    E.B. was first to perform commercial sex for multiple Johns per evening via "in calls" and "out calls" with customers entering and exiting rooms at Defendants' hotels as unannounced guests.

76.    E.B.'s trafficker and/or one of his two partners would pay for rooms in cash and reserved rooms under different names to avoid suspicion.

77.    E.B.'s trafficker would have her stay at different Defendant hotels for approximately two to three weeks at a time before moving on to other Defendant hotels for similar lengths of time.

78.    Prior to, during, and following the incidents described herein, the Defendants had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at their hotels including but not limited to video surveillance as well as oral and/or written complaints regarding said suspicious activity.

79.    The Defendants failed to take any actions to curtail these activities.

80.    If the Defendants had been paying attention to the activities conducted at their respective hotels and the "red flag" signs of sex trafficking as outlined herein it would have been impossible for Defendants not to have noticed the victimization of E.B.

### i.    Defendant Ritz Motel

81.    E.B.'s traffickers checked her into Defendant Ritz Motel on or about the middle of August, 2019 where they stayed for approximately one month and the rooms were paid for daily in cash. E.B. was seventeen (17) years old at the time.

82.    E.B. was forced to stay in her room by her traffickers and would service a steady stream of Johns per day via "in-calls" where they would enter and exit her room directly as obvious unannounced guests at the motel.

83.    When Defendant Ritz Motel's cleaning service staff would visit E.B.'s room she would provide them with dirty sheets and towels in exchange for clean ones and would also provide the trash which was littered with used condoms and condom wrappers and, on the occasions when cleaning staff would enter her room, condoms were left out in open and obvious areas of the room.

84.    Early during her stay at Defendant Ritz Motel E.B.'s traffickers forced her to change rooms due to a loud altercation with a customer who refused to wear a condom and attempted to throw a chair in frustration.

85.    Toward the end of their stay at Defendant Ritz Motel, on or about late August of 2019 or early of September 2019, two of E.B.'s traffickers got into a fight with one another and the police responded to the room.

ii.      **Defendant Flora Motel**

86.      E.B.'s traffickers checked her into Defendant Flora Motel on or about September of 2019 where they stayed for approximately two (2) to three (3) weeks and the rooms were paid for daily by her traffickers in cash.

87.      E.B. was observed by staff at Defendant Flora Motel's front desk would occasionally ask for ice for the room.

88.      E.B. was forced by her traffickers to service a steady stream of Johns per day via "in-calls" where they would enter and exit her room directly as obvious unannounced individuals at the motel and would also service other guests of the motel in their respective room(s).

89.      During their stay at Defendant Flora Motel one of E.B.'s traffickers was asked by hotel staff for more money because the staff observed too many people coming in and out of E.B.'s room and later were asked to switch to a room closer to the front desk so staff could monitor the number of individuals coming and going from the room.

90.      E.B. was also forced by her traffickers to perform "out calls" to service Johns away from the motel and when she did she would be picked up by Uber or a similar ride-sharing service in front of Defendant Flora Motel's front desk.

91.      When Defendant Flora Motel cleaning staff would visit E.B.'s room E.B. would stay in the room while the staff member worked and was observed repeatedly by cleaning staff member(s). E.B. would give the staff member the trash which was littered with condoms and condom wrappers and on one occasion the staff member had to unclog the toilet due to the presence of flushed condoms and condom wrappers.

24

92.    On one occasion after an "in call" John of E.B.'s arrived at her room a front desk employee called her room, told her she could not have visitors, and threatened to call the police if the person did not leave. Following this conversation, one of E.B.'s traffickers had an argument with the employee and E.B. recalls the employee telling her trafficker that they were "aware of what he was doing with that young girl."

### iii.    Defendant Howard Johnson by Wyndham Newark Airport

93.    E.B.'s traffickers checked her into Defendant Howard Johnson by Wyndham Newark Airport ("Howard Johnson") on or about September of 2019 where they stayed for approximately two (2) to three (3) weeks and the rooms were paid for daily by her traffickers in cash.

94.    E.B. was observed by staff at Defendant Howard Johnson's front desk because the only way to enter and exit the hotel was through the lobby. However, E.B. attempted to avoid eye contact and her face while walking through the lobby and would take the stairs instead of the elevators.

95.    E.B. was observed by Defendant Howard Johnson staff members who worked at a restaurant across from the front desk in the lobby of the hotel where E.B. would order and pick up food.

96.    E.B. was forced to service Johns in her room and would service a steady stream of Johns per day via "in-calls" as well as additional Johns during the evening where they would enter and exit via the hotel lobby as obvious unannounced guests at the hotel.

97.    During their stay at Defendant Howard Johnson E.B.'s traffickers got into a fight with one another and E.B. waited outside a hotel room for approximately thirty to forty minutes

where she was approached by several staff members of Defendant Howard Johnson who "asked if she was ok" and told her she could not loiter in the hallway.

98.     When Defendant Howard Johnson's cleaning staff would visit E.B.'s room E.B. would stay in the room while the staff member worked and E.B. was observed repeatedly by cleaning staff member(s). E.B. would give the staff member the trash which was littered with condoms and condom wrappers.

99.     On one occasion during their stay at Defendant Howard Johnson E.B.'s traffickers again fought with one another and left behind blood in the room. When cleaning staff visited the room following the fight, they asked about the blood in the room to which E.B. falsely took the blame for.

iv.     **Defendant Knights Inn**

100.    E.B.'s traffickers checked her into Defendant Knights Inn on or about October of 2019 where they stayed for approximately two (2) to three (3) weeks and then intermittently in November and December of 2019. The rooms were paid for daily by her traffickers in cash.

101.    E.B. was forced by her traffickers to regularly service Johns during the day via "in-calls" where they would enter and exit her room directly as obvious unannounced guests at the motel.

102.    E.B. and visiting Johns were observed by staff members of Defendants Knights Inn because the layout of the hotel was such that persons had to walk by the front desk to access the motel rooms and because E.B.'s traffickers would have to go to the front desk for clean sheets and towels.

26

v.    **Defendant Oak Grand Motel**

103.    E.B.'s traffickers checked her into Oak Grand Motel on or about October of 2019 as well as in December of 2019 and January of 2020 where they stayed for several weeks. The rooms were paid for daily by her traffickers in cash and, after their stay lengthened, the rooms were paid for in cash on a weekly basis.

104.    E.B. was forced to service traffickers in her room(s) and would service a steady stream of Johns per weekday via "in-calls" with more Johns arriving on the weekends. The Johns would enter and exit her room directly as obvious unannounced guests at the motel.

105.    E.B. was observed by Defendant Oak Grand Motel staff who were working the front desk and would see her when she would ask for ice or a new key when a new room was rented at the motel. Staff members would also routinely take cigarette breaks outside the front desk office where they could observe Johns coming and going to E.B.'s room(s) at the motel.

106.    E.B.'s traffickers would leave money and cash in open and obvious areas of the room that could be seen by Defendant Oak Grand Motel's cleaning staff. The rooms occupied by E.B. and her traffickers were also littered with condoms and condom wrappers that were open and obvious to cleaning staff. E.B. would stay in the room while cleaning staff cleaned. The garbage was filled with condoms and condom wrappers and on at least one occasion the toilet had to be cleaned of used condoms.

107.    During their stay at Defendant Oak Grand Motel there was an altercation with a client who became angry and kicked a motel room door because he thought he was "being set up." However, Defendant Oak Grand Motel staff did not respond.

108.    On another night during their stay at Defendant Oak Grand Motel, two of E.B.'s traffickers got into a fight with one another that was loud enough that the front desk staff notified

27

E.B. that the police had been called. When the police arrived E.B. left the room out of fear until the officers eventually left.

### vi.     Defendant Motel 6

109.    E.B.'s traffickers checked her into Defendant Motel 6 approximately late October of 2019. The rooms were paid for daily by her traffickers in cash.

110.    E.B. was forced to service traffickers in her room(s) and would service a steady stream of Johns per weekday via "in-calls." The Johns would enter and exit her room directly as obvious unannounced guests at the motel.

111.    During their stay, Defendant Motel 6 cleaning staff would not enter the motel rooms. A cleaning staff member would knock on the door and E.B. would exchange sheets and towels and would give the cleaning staff the garbage that would be littered with condoms and condom wrappers.

112.    On one occasion during their stay, E.B.'s traffickers got into a loud fight with one another that was heard by other guests at the motel. One of E.B.'s traffickers yelled at the other something about "pimping out a minor." This fight led into an additional altercation involving multiple people with lots of screaming and blood and led one of the other motel guests to call the police. E.B. spoke to the police when they arrived and advised she was not involved with the altercation.

### vii.     Defendant Royal Motel

113.    E.B.'s stay at Defendant Royal Motel was for four or five days. The room was paid for daily in cash by one of E.B.'s customers.

28

## E. Defendants Facilitated The Trafficking of E.B.

114. Defendants profited from the sex trafficking of E.B. and either knowingly or negligently aided and engaged with her trafficker and/or his partners in his sex trafficking venture.

115. The Defendants leased rooms to E.B.'s traffickers when they knew, or should have known, that the traffickers were using the rooms to imprison E.B., abuse her, torment her, and subject her to repeated exploitation as they forced her into sexual servitude via threats of physical violence.

116. Defendants knew, or should have known, that E.B. was being trafficked and that Defendants were knowingly benefiting financially from said exploitation because E.B.'s traffickers frequented Defendants' hotels.

117. Defendants knew, or should have known, that E.B. was being trafficked because E.B. constantly entertained traffic to appease her traffickers' wishes and her traffickers would help check her in then not proceed to the room, behavior that indicated they were using Defendants' hotels for an illegal sex trafficking venture.

118. Defendants actively participated in this illegal endeavor by knowingly or negligently providing lodging to E.B.'s traffickers in which to harbor E.B. while they were trafficking her.

119. Defendants profited from the sex trafficking of E.B. and knowingly or negligently aided and participated with E.B.'s traffickers in their criminal venture.

120. Defendants took no action as E.B. and her traffickers repeatedly visited their hotels, often with different guests, without any luggage, avoiding eye contact, paying daily for rooms in cash, never leaving the room and giving the maid the laundry to do directly, visible condoms and condom wrappers in the room and the trash, in addition to other signs of sex trafficking.

29

121.    Defendants actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from E.B. in which to harbor E.B. while she was being trafficked.

122.    Defendants had the opportunity to stop E.B.'s traffickers and offenders like them from victimizing E.B. and others like her but instead Defendants failed to take reasonable measure sot stop sex trafficking from occurring at their hotels.

123.    Defendants financially benefited from the sex trafficking of E.B. and other victims like her and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

124.    Defendants enjoy the steady stream of income that sex traffickers bring to their hotels.

125.    Defendants financially benefit from their ongoing reputations for privacy, discretion, and the facilitation of commercial sex.

126.    Defendants failed to take any steps to alert the authorities, properly intervene, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation at their hotels.

127.    Defendants maintained these deficiencies to maximize profits by:

a.      Reducing the cost of training employees and managers in how to spot the signs of human trafficking and sexual exploitation and what steps to take in the event same is suspected;

b.      Failing to refuse room rentals or report guests to law enforcement in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms were rented to sex traffickers or buyers;

c.     Lowering security costs by not having proper security measures including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation.

128.    As a direct and proximate result of these egregious practices on the part of Defendants and victims of sex trafficking and exploitation like her, E.B. has been permanently injured and damaged physically, emotionally, psychologically, and financially.

**CAUSES OF ACTION**
**COUNT ONE – 18 U.S.C. §1595**
**Trafficking Victims Protection Reauthorization Act**

129.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 94 of this complaint as if same were set forth at length herein.

130.    E.B. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

131.    Specifically, each and every one of the Defendants named herein had a statutory obligation not to benefit financially from a venture that they knew, or should have known, was engaged in violations of 18 U.S.C. §1591(a).

132.    At all relevant times, Defendants breached this duty by participating in, and facilitating, the harboring and provision of E.B. for purposes of commercial sex induced by force, fraud, or coercion by their acts, omissions, and commissions.

133.    Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low and maintaining the loyalty of the segment of its customer base that seeks to participate in the sex trade.

134.    Defendants have directly benefited from the trafficking of E.B. on each occasion they received payment for rooms that she was being kept in at Defendants' hotels.

31

135.    The actions, omissions, and/or commissions alleged in this complaint were the but-for and proximate cause of E.B.'s injuries and damages.

136.    E.B. has suffered substantial physical and psychological injuries as a result of being trafficked and sexually exploited at the Defendants' hotels in violation of 18 U.S.C. §1591(a).

### COUNT TWO – N.J.S.A. 2C:13-8.1

137.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 102 of this complaint as if same were set forth at length herein.

138.    E.B. is a victim of sex trafficking within the meaning of P.L.2005, c. 77 (N.J.S.A. 2C:13-8) and/or section 5 of P.L.2013, c. 51 (N.J.S.A. 2C:13-9) and is therefore entitled to bring a civil action under N.J.S.A. 2C:13-8.1.

139.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined in all of the foregoing paragraphs, constitute a violation or multiple violations of N.J.S.A. 2C:13-8.1.

140.    Specifically, each and every one of the Defendants had a statutory obligation not to benefit financially from a venture that they knew or should have known was engaged in the sex trade.

141.    At all relevant times, the Defendants breached this duty by knowingly participating in, and facilitating, the harboring and provision of E.B. for purposes of commercial sex induced by force, fraud, or coercion by their acts, omissions, or commissions.

142.    Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low and maintaining the loyalty of the segment of its customer base that seeks to participate in the sex trade.

143.    Defendants have directly benefited from the trafficking of E.B. on each occasion they received payment for rooms that she was being kept in at Defendants' hotels.

32

144. The actions, omissions, and/or commissions alleged in this complaint were the but-for and proximate cause of E.B.'s injuries and damages.

145. E.B. has suffered substantial physical and psychological injuries as a result of being trafficked and sexually exploited at the Defendants' hotels in violation of N.J.S.A. 2C:13-8.1.

## COUNT THREE - NEGLIGENCE

146. Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 111 of this complaint as if same were set forth at length herein.

147. At all material times, Defendants owed a duty to Plaintiff to use reasonable care to ensure the safety, care, wellbeing, and health of Plaintiff while she was staying at their hotels.

148. At all material times, Defendants duties encompassed the hiring, screening, appointment, retention, and/or supervision of employees that would otherwise provide a safe environment for Plaintiff.

149. At all material times, Defendants knew, or should have known, that Plaintiff was a sex trafficking victim.

150. Defendants knew, or should have known, based upon myriad signs or "red flags" that Plaintiff was being abused, assaulted, controlled, and otherwise exploited, sexually or otherwise, while staying at their hotels.

151. Defendants breached their duty of care and were negligent by failing to protect Plaintiff from sex trafficking venture(s) that Defendants knew or should have known was occurring at their hotels.

152. Despite their knowledge regarding the sexual exploitation of Plaintiff, Defendants failed to take any remedial action, conduct a good faith investigation, or take any other actions whatsoever to ensure the health and safe of Plaintiff.

153.    At all relevant times, Defendants had grossly inadequate policies and procedures to protect sex trafficking victims, including Plaintiff as well as other individuals.

154.    As a direct and proximate result of the Defendants' negligence, Plaintiff was sex trafficked, sexually exploited, and repeatedly victimized at the Defendant hotels.

155.    Defendants' actions, omissions, or commissions, taken separately and/or together, constitute negligence and said negligence as outlined in this complaint is the but-for and proximate cause of Plaintiff's injuries and damages.

156.    E.B. has suffered substantial physical and psychological injuries as a result of being trafficked and sexually exploited as a result of Defendants' negligence.

## REQUESTS FOR RELIEF

**WHEREFORE** on the basis of all of the foregoing, Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff and against the Defendants, and that the jury selected award damages to the Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of the Defendants' wrongs and injuries to the Plaintiff due to the Defendants' conduct, including those sums that would be reasonable and properly compensate her in accordance with the laws of the State of New Jersey, those including but not limited to:

1.    All available compensatory damages for the described losses with respect to each cause of action;

2.    Past and future medical expenses, as well as the costs associated with past and future life care;

3.    Past and future lost wages and loss of earning capacity;

4.    Past and future emotional distress;

34

5.    Consequential and/or special damages;

6.    All available noneconomic damages, including without limitation to pain, suffering, and loss of enjoyment of life;

7.    Punitive damages with respect to each cause of action;

8.    Reasonable and recoverable attorneys' fees;

9.    Costs of this action; and

10.    Pre-judgment and all other interest recoverable.

Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for other damages and equitable relief the Court or jury deems appropriate under the circumstances.

Dated: March 11, 2021

BRAMNICK, RODRIGUEZ, GRABAS, ARNOLD & MANGAN, LLC
*Attorneys for Plaintiff*

GAVIN I. HANDWERKER